M. ANDERSON BERRY (262879)
aberry@justice4you.com
GREGORY HAROUTUNIAN (330263)
gharoutunian@justice4you.com
BRANDON P. JACK (325584)
bjack@justice4you.com
**CLAYEO C. ARNOLD**
**A PROFESSIONAL LAW CORPORATION**
6200 Canoga Avenue, Suite 375
Woodland Hills, CA 91367
T: (747) 777-7748
F: (916) 924-1829

*Attorneys for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER MELITO and VANESSA MELITO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>OPTIMA TAX RELIEF, LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Peter Melito and Vanessa Melito, individually, and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant Optima Tax Relief, LLC ("Defendant" or "Optima"), to obtain damages, restitution, and injunctive relief for the Class as defined below, from Defendant.

Plaintiffs make the following allegations on information and belief, except as to their own actions, which are made on personal knowledge, the investigation of their counsel, and the facts that are a matter of public record.

## I.  INTRODUCTION

1.     This class action arises out of the recent targeted cyberattack and data breach ("Data Breach") on Optima's network that resulted in unauthorized access to highly sensitive data.[1] As a result of the Data Breach, Class and Subclass Members suffered ascertainable losses in the form of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress, and the present risk of imminent harm caused by the compromise of their sensitive personal information.

2.     The specific information compromised in the Data Breach includes personally identifiable information ("PII"), including full names and Social Security numbers.

3.     Upon information and belief, prior to and through May 2022, Defendant obtained the PII of Plaintiffs and Class Members and stored that PII, unencrypted, in an Internet-accessible environment on Defendant Optima's network, in which

---

[1] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/c0976e63-a29e-49aa-9df5-20d58d3e834d.shtml (last visited May 8, 2023).

unauthorized actors used an extraction tool to retrieve Social Security numbers from Optima's network.

4.      Plaintiffs and Class Members' PII—which were entrusted to Defendant, their officials, and agents—were compromised and unlawfully accessed due to the Data Breach.

5.      Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of theirs and Class Members' PII that Defendant collected and maintained, and for Defendant's failure to provide timely and adequate notice to Plaintiffs and other Class Members that their PII was subject to the unauthorized access of an unknown, unauthorized party.

6.      Defendant maintained the PII in a negligent and/or reckless manner. In particular, the PII was maintained on Defendant's computer system and network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Defendant, thus Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

7.      In addition, upon information and belief, Defendant and its employees failed to properly monitor the computer network, IT systems, and integrated service that housed Plaintiffs' and Class Members' PII.

CLASS ACTION COMPLAINT

8.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct because the PII that Defendant collected and maintained is now in the hands of malicious cybercriminals. The risks to Plaintiffs and Class Members will remain for their respective lifetimes.

9.     Defendant failed to provide timely, accurate and adequate notice to Plaintiffs and Class Members. Plaintiffs' and Class Members' knowledge about the PII that Defendant lost, as well as precisely what type of information was unencrypted and in the possession of unknown third parties, was unreasonably delayed by Defendant's failure to warn impacted persons immediately upon learning of the Data Breach.

10.     In its report to the Maine Attorney General's office and its letters dated May 2, 2023, Defendant Optima notified Plaintiffs and many Class Members about the widespread data breach that had occurred on Defendant Optima's computer network and that Class Members' PII was accessed and acquired by malicious actors.[2]

11.     The Notice provided to Plaintiffs and the Class Members is as follows:

As you may know, Optima Tax Relief, LLC ("Optima") provides tax relief and resolution services for clients with outstanding tax liabilities with the IRS and/or state taxing authorities. We are writing to inform you of a data security incident that may have exposed your

---

[2] *Id.*

personal information. Optima strives to maintain the highest standards of data security and integrity at all times. Therefore, we take the security of your personal information very seriously and want to provide you with information and resources you can use to protect that information.

<u>What Happened and What Information was Involved:</u>

In early November 2022, Optima discovered a cybersecurity incident impacting our network. Upon detecting this incident, we immediately and proactively moved quickly to secure our network environment and launched a thorough investigation. The investigation was performed with the help of a reputable, experienced and independent IT security and forensic investigators. This was done to determine the scope and extent of the potential unauthorized access to our systems and any personal information.

After the comprehensive forensic investigation into this incident concluded, we discovered that your name, mailing address, date of birth, and/or social security number, to the extent that such may have existed on the network, may have been involved as a result of this incident.

CLASS ACTION COMPLAINT

**What We Are Doing:**

We take the security of all information within our control very seriously. Optima has prioritized its commitment to privacy and maintaining the highest levels of data security, thus we are taking steps to prevent a similar event from occurring in the future by implementing additional safeguards and enhanced security measures to better protect the privacy and security of information in our systems. We have also reviewed and taken thorough steps to enhance our policies and procedures relating to the security of our systems and servers, as well as our information life cycle management.

**What You Can Do:**

Optima is pleased to offer you credit monitoring and identity theft protection services free of charge through IDX, which is a highly reputable, time-tested, and trusted organization. These services include 12 months of credit monitoring, as well as fully managed identity theft recovery services. With this protection, IDK will help you resolve any issues if your identity is compromised.[3]

---

[3] *Id.*

CLASS ACTION COMPLAINT

12.     Defendant Optima acknowledged its investigation into the Data Breach in its Notice of Data Incident and determined that there was unauthorized access to Plaintiffs' and Class Members' PII on or around November 2022.

13.     Defendant Optima's Notice of Data Incident correspondence further admitted that the PII accessed included individuals' names and Social Security numbers.[4]

14.     Armed with the PII accessed in the Data Breach, data thieves can commit a variety of crimes including opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to target other phishing and hacking intrusions using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a present, heightened, and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now closely monitor their financial accounts to guard against identity theft for the rest of their lives.

---

[4] *Id.*

CLASS ACTION COMPLAINT

16.     Plaintiffs and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17.     By their Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose PII was accessed during the Data Breach.

18.     Accordingly, Plaintiffs bring claims on behalf of themselves and the Class for: (i) negligence, (ii) invasion of privacy, (iii) breach of fiduciary duty, (iv) unjust enrichment, (v) violations of New York General Business Law § 349, and (vi) declaratory judgment and injunctive relief. Through these claims, Plaintiffs seek, *inter alia*, damages and injunctive relief, including improvements to Defendant's data security systems and integrated services, future annual audits, and adequate credit monitoring services.

## II.   **PARTIES**

19.     Plaintiff Peter Melito is a natural person, resident, and citizen of Niskayuna, New York where he intends to remain. He is a Data Breach victim, having received Optima's breach notice in May 2023.

20.     Plaintiff Vanessa Melito is a natural person, resident, and citizen of Niskayuna, New York where she intends to remain. She is a Data Breach victim, having received Optima's breach notice in May 2023.

21.     Defendant Optima Tax Relief, LLC is a provider of tax services, specializing in tax relief and resolution services. Optima is headquartered at 3100 S. Harbor Blvd., Ste 250 Santa Ana, California 92704.

### III.    JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiffs and at least one member of the putative Class, as defined below, are citizens of a different state than Defendant, there are more than 100 putative class members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

23.     This Court has personal jurisdiction over Defendant because Defendant and/or its parents or affiliates are headquartered in this District and Defendant conducts substantial business in California and this District through its headquarters, offices, parents, and affiliates.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal places of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

### IV.    BACKGROUND FACTS

**A.     Defendant's Businesses**

25.     Defendant Optima is a business that provides tax relief and resolution services.

CLASS ACTION COMPLAINT

26.     On information and belief, Defendant maintain the PII of customers, applicants, and others, including but not limited to:

> a.     name, address, phone number and email address;
>
> b.     date of birth;
>
> c.     demographic information;
>
> d.     Social Security number;
>
> e.     financial information;
>
> f.     photo identification;
>
> g.     employment information, and;
>
> h.     other information that Defendant may deem necessary to provide its services.

27.     Plaintiffs and Class Members directly or indirectly entrusted Defendant with sensitive and confidential PII, which includes information that is static, does not change, and can be used to commit myriad financial crimes.

28.     Because of the highly sensitive and personal nature of the information that the Defendant acquires, stores, and has access to. Defendant, upon information and belief, promised to, among other things: keep PII private; comply with industry standards related to data security and PII; inform individuals of their legal duties and comply with all federal and state laws protecting PII; only use and release PII for

reasons that relate to tax relief and resolution services; and provide adequate notice to impacted individuals if their PII is disclosed without authorization.

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure.

30.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

31.     Plaintiffs and the Class Members relied on Defendant to implement and follow adequate data security policies and protocols, to keep their PII confidential and securely maintained, to use such PII solely for business purposes, and to prevent the unauthorized disclosures of the PII.

**B.     Defendant Fails to Safeguard Consumer PII**

32.     In or around early November 2022, Defendant Optima discovered a cybersecurity incident impacting their network.

33.     Defendant Optima investigated the cybersecurity incident and determined that private information related to certain customers and other individuals on Defendant Optima's network was accessed and taken by an unauthorized user in early November 2022.

34.     Upon information and belief, Plaintiffs' and Class Members' PII was exfiltrated and stolen in the attack.

35.     It is likely the Data Breach was targeted at Defendant due to its status as financial and tax services related service provider that collects, creates, and maintains sensitive PII.

36.     Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data of specific individuals, including (among other things) the PII of Plaintiffs and the Class Members.

37.     Defendant Optima admitted that the stolen information included full names and Social Security numbers.

38.     While Defendant Optima stated in the notice letter that the unauthorized activity occurred and was discovered in or around early November 2022, Defendant did notify the specific persons or entities whose PII was acquired and exfiltrated until May 2, 2023—over six months after the Data Breach occurred in or around early November 2022.

39.     Upon information and belief, and based on the type of cyberattack, it is plausible and likely that Plaintiffs' PII was stolen in the Data Breach. Plaintiffs further believe their PII was likely subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals.

///

40.     Defendant had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties.

41.     In response to the Data Breach, Defendant Optima admits it worked with "independent IT security and forensic investigators" to determine the nature and scope of the incident and purports to have taken steps to secure the systems. Defendant Optima admits additional security was required, but there is no indication whether these steps are adequate to protect Plaintiffs' and Class Members' PII going forward.

42.     Because of the Data Breach, data thieves were able to gain access to Defendant's private systems for an undisclosed period of time and were able to compromise, access, and acquire the protected PII of Plaintiffs and Class Members.

43.     Defendant had obligations created by contract, industry standards, common law, and its own promises and representations made to Plaintiffs and Class Members to keep their PII confidential and to protect them from unauthorized access and disclosure.

44.     Plaintiffs and Class Members reasonably relied (directly or indirectly) on these sophisticated parties to keep their sensitive PII confidential; to maintain proper system security; to use this information for business purposes only; and to make only authorized disclosures of their PII.

45.     Plaintiffs' and Class Members' unencrypted, unredacted PII was compromised due to Defendant's negligent, careless acts and omissions, and to the utter

failure to protect Class Members' PII. Criminal hackers obtained their PII because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The risks to Plaintiffs and Class Members will remain for their respective lifetimes.

### C.    The Data Breach was a Foreseeable Risk and Defendant Was on Notice

46.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the financial and tax services industry and other industries holding significant amounts of PII preceding the date of the breach.

47.    In light of recent high profile data breaches at other financial and tax services partners and provider companies, Defendant knew or should have known that their electronic records and PII they maintained would be targeted by cybercriminals and ransomware attack groups.

48.    Defendant knew or should have known that these attacks were common and foreseeable. In 2022, there were 1,802 data breaches, nearly eclipsing 2021's record wherein 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[5] The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared

---

[5] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6 (last visited May 8, 2023).

to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[6] [7]

49.    In light of recent high profile cybersecurity incidents within Defendant Optima's website and at other financial and tax services partners and provider companies, Defendant knew or should have known that their electronic records would be targeted by cybercriminals.

50.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

**D.    Defendant Fails to Comply with FTC Guidelines**

51.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[6]    See *Data Breaches Hit Lots More People in 2022* (Jan. 25, 2023) https://www.cnet.com/tech/services-and-software/data-breaches-hit-lots-more-people-in-2022/ (last visited May 8, 2023).

[7] *Id.*

52.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security problems.[8] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[9]

53.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[8] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 8, 2023).

[9] *Id.*

54. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

55. These FTC enforcement actions include actions against financial and tax services providers and partners like Defendant.

56. Defendant failed to properly implement basic data security practices.

57. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers and other impacted individuals' PII constitutes an unfair act or practice prohibited by Sec. 5 of the FTC Act, 15 U.S.C. §45.

58. Defendant was at all times fully aware of their obligation to protect the PII. Defendant was also aware of the significant repercussions that would result from their failure to do so.

**E.    Defendant Fails to Comply with Industry Standards**

59. As shown above, experts studying cyber security routinely identify financial and tax services providers and partners as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

60.    Several best practices have been identified that at a minimum should be implemented by financial and tax services providers like Defendant, including but not limited to, educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

61.    Other best cybersecurity practices that are standard in the financial and tax services industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

62.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

63.    These foregoing frameworks are existing and applicable industry standards in the financial services industry, and Defendant failed to comply with these

accepted standards, thereby opening the door to the cyber incident and causing the data breach.

**F.    Defendant's Breach**

64.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and website's application flow. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

  a.    failing to maintain an adequate data security system to reduce the risk of data breaches and cyber attacks;

  b.    failing to adequately protect PII;

  c.    failing to properly monitor their own data security systems for existing intrusions;

  d.    failing to ensure that their vendors with access to their computer systems and data employed reasonable security procedures;

  e.    failing to ensure the confidentiality and integrity of electronic PII it created, received, maintained, and/or transmitted;

  f.    failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights;

g.    failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

h.    failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports;

i.    failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PII;

j.    failing to train all members of their workforces effectively on the policies and procedures regarding PII;

k.    failing to render the electronic PII it maintained unusable, unreadable, or indecipherable to unauthorized individuals;

l.    failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

m.    failing to adhere to industry standards for cybersecurity as discussed above; and,

n.    otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' PII.

65.    Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' PII by allowing cyberthieves to access Defendant's network, which provided unauthorized actors with unsecured and unencrypted PII.

66.     Accordingly, as outlined below, Plaintiffs and Class Members now face a present, increased risk of fraud and identity theft. In addition, Plaintiffs and the Class Members also lost the benefit of the bargain they made with Defendant.

**G.     Data Breaches Cause Disruption and Increased Risk of Fraud and Identity Theft**

67.     Cyberattacks and data breaches at financial and tax services companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

68.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[10]

69.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and

---

[10] *See* U.S. Gov. Accounting Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (2007) https://www.gao.gov/new.items/d07737.pdf (last visited May 8, 2023).

harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

70.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[11]

---

[11]    *See    IdentityTheft.gov*, FEDERAL    TRADE    COMMISSION, https://www.identitytheft.gov/Steps (last visited May 8, 2023).

71.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

72.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

73.    Moreover, theft of PII is also gravely serious because PII is an extremely valuable property right.[12]

_____

[12] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

74.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

75.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used.

76.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

77.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

_____

[13] GAO Report, at p. 21.

78.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

79.     Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

80.     PII can sell for as much as $363 per record according to the Infosec Institute.[14] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for many years.

81.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[15] Such fraud may go undetected until debt collection calls commence months, or

---

[14] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited May 8, 2023).

[15] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION (2018) at 1, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 8, 2023).

even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[16] Each of these fraudulent activities is difficult to detect. An individual may not know that their Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

82.    Moreover, it is not an easy task to change or cancel a stolen Social Security Number.

83.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[17]

---

[16] *Id* at 4.

[17] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited May 8, 2023).

84.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[18]

85.     Because of the value of its collected and stored data, the financial services industry has experienced disproportionally higher numbers of data theft events than other industries.

86.     For this reason, Defendant knew or should have known about these dangers and strengthened its data and email handling systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendant failed to properly prepare for that risk.

**H.     Plaintiffs' and Class Members' Damages**

87.     To date, Defendant has done nothing to provide Plaintiffs and the Class Members with relief for the damages they have suffered as a result of the Data Breach.

---

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, COMPUTER WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 8, 2023).

88.    Defendant Optima has merely offered Plaintiffs and Class Members complimentary fraud and identity monitoring services for one year, but nothing to compensate them for damages incurred and time spent dealing with the Data Breach.

89.    Plaintiffs and Class Members have been damaged by the compromise of their PII in the Data Breach.

90.    Plaintiffs and Class Members' full names and Social Security numbers were compromised in the Data Breach and are now in the hands of the cybercriminals who accessed Defendant's software maintaining PII.

91.    Since being notified of the Data Breach, Plaintiffs have spent time dealing with the impact of the Data Breach, valuable time Plaintiffs otherwise would have spent on other activities, including but not limited to work and/or recreation.

92.    Due to the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring their accounts for fraudulent activity.

93.    Plaintiffs' PII was compromised as a direct and proximate result of the Data Breach.

94.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

95.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

96.     Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

97.     Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

98.     Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

99.     Plaintiffs and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

100.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but

CLASS ACTION COMPLAINT

was not. Part of the price Plaintiffs and Class Members paid to Defendant was intended to be used by Defendant to fund adequate security of Defendant's systems and Plaintiffs' and Class Members' PII. Thus, the Plaintiffs and the Class Members did not get what they paid for and agreed to.

101.   Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and sensitive information for misuse.

102.   Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

> a.   reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;
>
> b.   purchasing credit monitoring and identity theft prevention;
>
> c.   placing "freezes" and "alerts" with reporting agencies;
>
> d.   spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;
>
> e.   contacting financial institutions and closing or modifying financial accounts; and

CLASS ACTION COMPLAINT

f.      closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

103.   Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of adequate security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online and that access to such data is password protected.

104.   Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

105.   As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

***Plaintiff Peter Melito's Experience***

106.   Plaintiff Peter Melito provided his PII to Defendant in exchange for their services. Defendant required that Plaintiff Peter Melito provide this information as a condition to providing him financial and tax services.

107.    Plaintiff Peter Melito is very careful about sharing his sensitive Private Information. Plaintiff Peter Melito has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

108.    Plaintiff Peter Melito first learned of the Data Breach after receiving a data breach notification letter dated May 2, 2023, from Optima, notifying him that Defendant suffered a data breach and that his PII had been improperly accessed and/or obtained by unauthorized third parties while in possession of Defendant.

109.    The data breach notification letter indicated that the PII involved in the Data Breach may have included Plaintiff Peter Melito's full name, mailing address, date of birth, and/or Social Security number.

110.    Since the date of the Data Breach, Plaintiff Peter Melito has experienced a severe uptick in suspicious emails, scam calls, and text messages that appear to be targeted phishing or spear phishing attempts from scammers.

111.    As a result of the Data Breach, Plaintiff Peter Melito made reasonable efforts to mitigate the impact of the Data Breach after receiving the data breach notification letter, including but not limited to researching the Data Breach, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

112.    Plaintiff Peter Melito has spent multiple hours and will continue to spend valuable time for the remainder of his life, that he otherwise would have spent on other

activities, including but not limited to work and/or recreation. As such, Plaintiff has spent significant time trying to mitigate the breach by, *inter alia*:

   a.   checking his banking and credit card statements to search for suspicious activity;

   b.   checking his credit report to search for suspicious activity;

   c.   researching and purchasing credit and identity protection services; and

   d.   assisting his wife with the credit card fraud she experienced as a result of the Data Breach;

113.   Plaintiff Peter Melito suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of his privacy rights; (c) the theft of his PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

114.   As a result of the Data Breach, Plaintiff Peter Melito has also suffered emotional distress as a result of the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft

and fraud. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

115.   As a result of the Data Breach, Plaintiff Peter Melito anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for the remainder of his life.

***Plaintiff Vanessa Melito's Experience***

116.   Plaintiff Vanessa Melito provided her PII to Defendant in exchange for their services. Defendant required that Plaintiff Vanessa Melito provide this information as a condition to providing her financial and tax services.

117.   Plaintiff Vanessa Melito is very careful about sharing her sensitive Private Information. Plaintiff Vanessa Melito has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

118.   Plaintiff Vanessa Melito first learned of the Data Breach after receiving a data breach notification letter dated May 2, 2023, from Optima, notifying her that Defendant suffered a data breach and that her PII had been improperly accessed and/or obtained by unauthorized third parties while in possession of Defendant.

///

119.   The data breach notification letter indicated that the PII involved in the Data Breach may have included Plaintiff Vanessa Melito's full name, mailing address, date of birth, and/or Social Security number.

120.   Since the date of the Data Breach, Plaintiff Vanessa Melito has experienced a severe uptick in suspicious emails, scam calls, and text messages that appear to be targeted phishing or spear phishing attempts from scammers.

121.   Plaintiff Vanessa Melito experienced actual identify theft and fraud, which includes discovering that more than $5,000.00 was charged to a credit card in her name. Specifically, in or around March 2023, an unauthorized third party used Plaintiff's personal information to obtain her credit card information and then attempted to purchase $5,000.00 worth of jewelry at store she had never visited.

122.   As a result of the Data Breach, Plaintiff Vanessa Melito made reasonable efforts to mitigate the impact of the Data Breach after receiving the data breach notification letter, including but not limited to researching the Data Breach, reviewing credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud.

123.   Plaintiff Vanessa Melito has spent multiple hours and will continue to spend valuable time for the remainder of her life, that she otherwise would have spent on other activities, including but not limited to work and/or recreation. As such, Plaintiff has spent significant time trying to mitigate the breach by, *inter alia*:

a.      checking her banking and credit card statements to search for suspicious activity;

b.      checking her credit report to search for suspicious activity;

c.      researching and purchasing credit and identity protection services; and

d.      dealing with the credit card fraud she experienced as a result of the Data Breach;

124.    Plaintiff Vanessa Melito suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant maintained belonging to Plaintiff; (b) violation of her privacy rights; (c) the theft of her PII; and (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

125.    As a result of the Data Breach, Plaintiff Vanessa Melito has also suffered emotional distress as a result of the release of her PII, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her PII for purposes of identity theft and fraud. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

///

126.   As a result of the Data Breach, Plaintiff Vanessa Melito anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for the remainder of her life.

## V.   CLASS ACTION ALLEGATIONS

127.   Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class").

128.   Plaintiffs propose the following Class and Subclass definitions, subject to amendment as appropriate:

> **All persons identified by Defendant (or its agents or affiliates) as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Class").**

> **All persons identified by Defendant (or its agents or affiliates) as being among those individuals residing in New York impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "New York Subclass").**

129.   Collectively the Class and New York Subclass are referred to as the Classes.

130.   Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and Members of their staff.

131.   Plaintiffs reserve the right to amend or modify the Class or Subclass definitions as this case progresses.

132.   <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of thousands of individuals whose sensitive data was compromised in the Data Breach.

133.   <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.   if Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

b.      if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.      if Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.      if Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.      if Defendant owed a duty to Class Members to safeguard their PII;

f.      if Defendant breached their duty to Class Members to safeguard their PII;

g.      if Defendant knew or should have known that their data security systems and monitoring processes were deficient;

h.      if Defendant should have discovered the Data Breach sooner;

i.      if Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.      if Defendant's conduct was negligent;

k.      if Defendant's breach implied contracts with Plaintiffs and Class Members;

l.      if Defendant were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m.     if Defendant failed to provide notice of the Data Breach in a timely manner, and;

n.     if Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

134.   <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

135.   <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

136.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

137.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent

a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would Have no effective remedy. The prosecution of separate actions by individuals would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial and the parties' resources, and protects the rights of each Class Member.

138.   Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

139.   Likewise, particular issues under Rule 42(d)(l) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    if Defendant failed to timely notify the public of the Data Breach;

    b.    if Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

    c.    if Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

     d.     if Defendant's failure to institute adequate protective security measures amounted to negligence;

     e.     if Defendant failed to take commercially reasonable steps to safeguard consumer PII; and

     f.     if adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

140.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant Optima.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and the Class)

141.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 140.

142.    Plaintiffs and the Class entrusted Defendant with their PII on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties.

143.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class would suffer if the PII were wrongfully disclosed.

CLASS ACTION COMPLAINT

144.   By collecting and storing this data in their computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard their computer system—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

145.   Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

146.   Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and individuals who entrusted them with PII, which is recognized by laws and regulations, as well as common law. Defendant was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm from a data breach.

147.   Defendant's duty to use reasonable security measures required Defendant to reasonably protect confidential data from any intentional or unintentional use or disclosure.

148.   In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

149.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant are bound by industry standards to protect confidential PII.

150.   Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.    failing to adequately monitor the security of their networks and systems;

    d.    failing to have in place mitigation policies and procedures;

    e.    allowing unauthorized access to Class Members' PII;

    f.    failing to detect in a timely manner that Class Members' PII had been compromised; and

g.   failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

151.   Defendant owed to Plaintiffs and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the data breach. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the data breach.

152.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

153.   Defendant breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

154.   Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from

Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiffs' and Class Members' PII.

155. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII—whether by malware or otherwise.

156. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members and the importance of exercising reasonable care in handling it.

157. Defendant breached its duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiffs and Class Members—which actually and proximately caused the Data Breach and injured Plaintiffs and Class Members.

158. Defendant further breached its duties by failing to provide reasonably timely notice of the data breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the data breach and Plaintiffs and Class Members' injuries-in-fact. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

159.    Defendant's breach of its common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the data breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Invasion of Privacy
**(On behalf of the Plaintiffs and the Class)**

160.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 140.

161.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

162.    Defendant owed a duty to Plaintiffs and Class Members to keep their PII confidential.

163.    The unauthorized disclosure and/or acquisition (*i.e.,* theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

164.   Defendant's reckless and negligent failure to protect Plaintiffs' and Class Members' PII constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

165.   Defendant's failure to protect Plaintiffs' and Class Members' PII acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

166.   Defendant knowingly did not notify Plaintiffs and Class Members in a timely fashion about the Data Breach.

167.   Because Defendant failed to properly safeguard Plaintiffs' and Class Members' PII, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

168.   As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

169.   Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

170.   Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

171.   Plaintiffs, on behalf of themselves and Class Members, seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII.

172.   Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

173.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 140.

174.   This count is pleaded in the alternative to breach of implied contract.

175.   Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

176.   As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

177.   Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their PII. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

178.   Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes.

179.   Plaintiffs and Class Members conferred a monetary benefit on Defendant, by paying Defendant as part of Defendant rendering financial and tax related services, a portion of which was to have been used for data security measures to secure Plaintiffs' and Class Members' PII, and by providing Defendant with their valuable PII.

180.   Defendant was enriched by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid the data security obligations at the

expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

181.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

182.   Defendant acquired the monetary benefit and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

183.   If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

184.   Plaintiffs and Class Members have no adequate remedy at law.

185.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching

how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

186.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

187.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiffs and the Class)

188.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 140.

CLASS ACTION COMPLAINT

189.   A relationship existed between Plaintiff, Class Members and Defendant in which Plaintiff and Class Members put their trust in Defendant to protect the private information of Plaintiff and Class Members and Defendant accepted that trust.

190.   Defendant breached the fiduciary duty that they owed to Plaintiffs and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the private information of Plaintiff and Class Members.

191.   Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

192.   But for Defendant's breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

193.   Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

194.   As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff are entitled to and demand actual, consequential, and nominal damages and injunctive relief.

## FIFTH CAUSE OF ACTION
### Violation of New York General Business Law § 349
### (On Behalf of Plaintiffs and the New York Subclass)

195.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 140.

196. New York's General Business Law § 349 ("GBL § 349") prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

197. In its provision of services throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of New York's GBL § 349.

198. Plaintiffs and the New York Subclass Members are consumers who conducted transactions with Defendant for their personal use.

199. By the acts and conduct alleged herein, Defendant has engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, the expectation that Defendant would implement adequate cybersecurity, when in fact Defendant did not.

200. The foregoing deceptive acts and practices were directed at consumers.

201. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the ability and measures taken by Defendant to safeguard consumer PII, and to induce consumers to enter transactions with Defendant.

202. By reason of this conduct, Defendant engaged in deceptive conduct in violation of GBL § 349.

203.   Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiffs and the New York Subclass Members have sustained from having provided their PII to Defendant, which was exposed in the Data Breach.

204.   As a result of Defendant's violations, Plaintiffs and the New York Subclass Members have suffered damages because: (a) they would not have provided their PII to Defendant had they known Defendant did not use reasonable security measures, including physical, administrative, and technical safeguards to help protect their information from unauthorized access, use and disclosure; (b) they have suffered identity theft and/or fraudulent charges and their PII has been devalued as a result of being exposed in the Data Breach; and (c) Plaintiffs and the New York Subclass Members must spend considerable time and expenses dealing with the effects of the Data Breach, and are now at greater risk for future harm stemming from the Data Breach.

205.   On behalf of themselves and other the New York Subclass Members, Plaintiffs seek to recover their actual damages or fifty dollars ($50), whichever is greater, three times actual damages, and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION
### Declaratory Judgment and Injunctive Relief
### (On Behalf of Plaintiffs and the Class)

206.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 140.

207. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

208. An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to employing reasonable data security. Plaintiffs allege Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiffs and the Classes continue to suffer injury due to the continued and ongoing threat of new or additional fraud against them or on their accounts using the stolen data.

209. Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Defendant owed, and continues to owe, a legal duty to employ reasonable data security to secure the PII it possesses, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

///

///

b.    Defendant breached, and continues to breach, its duty by failing to employ reasonable measures to secure its customers' personal and financial information; and

c.    Defendant's breach of its legal duty continues to cause harm to Plaintiffs and the Classes.

210.   The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect its employees' (i.e., Plaintiffs and the Classes') data.

211.   If an injunction is not issued, Plaintiffs and the Classes will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiffs and the Classes will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiffs and the Classes for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Classes, which include monetary damages that are not legally quantifiable or provable.

212.   The hardship to Plaintiffs and the Classes if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued.

213. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiffs, the Classes, and the public at large.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order;

    i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance

with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

vi. prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests,

and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

xi.    requiring Defendant to conduct regular database scanning and securing checks;

xii.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information,

as well as protecting the personal identifying information of Plaintiffs and Class Members;

xiii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

///

xvi.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

CLASS ACTION COMPLAINT

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: May 8, 2023,                          Respectfully Submitted,


By: */s/M. Anderson Berry*

M. Anderson Berry (262879)
aberry@justice4you.com
Gregory Haroutunian (330263)
gharoutunian@justice4you.com
Brandon P. Jack (325584)
bjack@justice4you.com
**CLAYEO C. ARNOLD**
**A PROFESSIONAL LAW CORPORATION**
6200 Canoga Avenue, Suite 375
Woodland Hills, CA 91367
T: (747) 777-7748
F: (916) 924-1829

*Attorneys for Plaintiffs and Proposed Class*